IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES DIXON, | ) | CASE NO. 1:12-CV-1213 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| v. | ) | |
| | ) | MAGISTRATE JUDGE McHARGH |
| | ) | |
| MATTHEW NEUBACHER, *et al.*, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendants. | ) | |

Plaintiff James Dixon filed suit under 42 U.S.C. § 1983 alleging that Defendants Corrections Officers Matthew Neubacher and Albert Naus ran afoul of the Constitution's guarantees under the Eight Amendment. (Doc. No. 26).  Plaintiff also brings state law claims against Defendants. (*Id.*).  The matter is before the Court on Defendants' motion for summary judgment (Doc. No. 32), Plaintiff's response in opposition to the motion (Doc. No. 35), and Defendants' reply in support of the motion. (Doc. No. 36).

For the reasons set forth below, the Court recommends that Defendants' motion be GRANTED in part and DENIED in part.

## I.      FACTS

On October 4, 2011, Dixon was an inmate at the Mansfield Correctional Institution in Mansfield, Ohio. (Deposition of James Dixon ("Dixon Dep.") at 7:13-19, Doc. No. 28).  Inmates were assigned a security level ranging from "Level 1 to Level 5," where Level 5 represented the most problematic or dangerous prisoners. (Deposition of Albert Naus ("Naus Dep.") at 21:8-21, Doc. No. 30).  Dixon was a security Level 4. (*Id.*).  He was in a single cell. (Dixon Dep. at 8:1-

1

2).  Dixon's cellblock contained two levels, with Dixon's cell located in the upper level. (Deposition of Matthew Neubacher ("Neubacher Dep.") at 13:18-19, Doc. No. 29).  Corrections Officers Neubacher and Naus oversaw Dixon's cellblock that evening. (*Id.* at 13:20-25).

While the officers were on duty, Dixon began talking to an inmate located in a cell across from his own, but within the same block of cells. (Dixon Dep. at 9:1-9).  Dixon claimed that because other inmates were speaking loudly to each other across the cellblock, he had to raise his voice in order to be heard. (*Id.* at 9:10-20).

Contrary to Dixon's account, Officer Neubacher described Dixon as kicking on his door, yelling, and attempting to get other inmates to do the same. (Neubacher Dep. at 10:12-15). Defendants were concerned that Plaintiff was engaged in "cell banging." (Naus Dep. at 13:3-22). Cell banging could result in chaotic activity among inmates, such as inmates yelling, throwing bodily fluids and food under their doors, flooding toilets and sinks, and flooding the range. (*Id.*).

Officer Neubacher went to Dixon's cell and instructed Dixon to be quiet. (Dixon Dep. at 9:21-10:4; Neubacher Dep. at 10:15-17).  After Officer Neubacher left the cell, Dixon resumed his prior conduct. (*Id.*).  Due to Plaintiff's noncompliance, Officer Neubacher, accompanied by Officer Naus, returned to Plaintiff's cell to conduct a search. (Neubacher Dep. at 10:18-22). Defendants explained that cell searching is a technique used to induce prisoners to cooperate. (Neubacher Dep. at 10:23-11:4; Naus Dep. at 14:3-9).

The officers approached Dixon's cell and instructed him to "cuff up," meaning that he was to back up to the cuff port located in the cell door, allowing an officer to handcuff his arms behind his back. (Dixon Dep. 10:8-18).  Plaintiff complied and then exited the cell as Officer Neubacher requested. (*Id.* at 10:16-11:10).  While Officer Neubacher entered the cell to search it, Officer Naus remained next to Plaintiff outside of the cell. (*Id.* at 11:11-12:4).  Dixon testified

2

that Officer Neubacher only "acted like he was looking for something" and appeared to make little effort to conduct a true search. (*Id.* at 12:5-24).

According to Dixon, Officer Neubacher ordered him to re-enter the cell, and Dixon did so. (Dixon Dep. at 14:19-22).  When the two were in the cell together, Neubacher asked Plaintiff whether he would be quiet, and Plaintiff responded that he would not. (*Id.* at 15:13-22).  The officer retrieved pepper spray from his hip. (*Id.* at 15:24).  Officer Neubacher then grabbed Dixon by the shirt, punched him in the face, pepper sprayed him, and "slung" him headfirst into a metal footlocker located on the floor of the cell. (*Id.* at 16:20-17:14, 19:5-16).  As he fell to the floor, Dixon struck his head on the footlocker. (*Id.* at 17:13-14).

Dixon maintains that when Neubacher retrieved his pepper spray, Naus was standing on the side of the open door of the cell. (Dixon Dep. at 15:25-16:5).  When Dixon collided with the footlocker, Naus "pulled" the cell door closed to the point where there was no longer an opening that would allow someone to see into the cell from the outside, but without engaging the lock on the door. (*Id.* at 21:9-22, 22:7-25).  Officer Neubacher was in the cell with Dixon when Officer Naus closed the door in the fashion that Dixon described. (*Id.* at 21:15-22).  Following Dixon's fall, Neubacher left the cell. (*Id.* at 22:2-4).

Dixon stated that roughly three or four minutes passed from the time that Neubacher ordered him to re-enter the cell until the end of their altercation. (Dixon Dep. at 27-28).  Dixon averred that he made no attempts to attack Neubacher while they were in the cell together. (*Id.* at 46:23-47:4).  Naus did not recall writing Dixon up for being disrespectful or disobedient based on the occurrence. (Naus Dep. at 36:16-21).

The parties present somewhat differing accounts of what Officer Naus was doing while the officers were at Dixon's cell.  Naus explained that while Neubacher searched the cell, Dixon

stood in front of the cell's open doorway, and he stood next to Dixon. (Naus. Dep. at 24:18-20). Officer Naus did not observe Officer Neubacher conduct the search, because he was focused on Dixon. (*Id.* at 26:23-27:4).

Officer Neubacher claimed that Naus came into the cell behind Dixon at some point after Dixon had re-entered. (Neubacher Dep. at 23:7-11, 32:1-7). Officer Naus and Dixon, however, did not indicate that Naus followed Dixon into the cell. Naus testified that when Dixon entered the cell before being sprayed, he was unable to see Officer Neubacher, because Dixon obstructed his view. (Naus Dep. at 43:25-44:4). Naus explained that it was standard procedure for officers to have their pepper spray in hand while conducting a search, and as a result, he knew Officer Neubacher had pulled his spray before Dixon entered the cell. (*Id.* at 33:7-13). Officer Naus stated he did not observe Neubacher raise his hand to pepper spray Dixon, but realized that the spray was released because he could smell it. (*Id.* at 33:14-21). Officer Naus also claimed that he did not see Dixon collide with the footlocker, but heard Dixon yelling that he had hit his head and needed to see a nurse. (*Id.* at 33:22-25, 35:12-17).

Following the incident, Dixon suffered pain in his eyes from the pepper spray, a knot above his left ear, a swollen jaw, and an abrasion on his chest. (Dixon Dep. at 44:9-19). Dixon claimed that he remained handcuffed in his cell for approximately 30 minutes before receiving medical attention. (*Id.* at 23-24, 39:16-22). A nurse examined Dixon, performed a skin stich, and administered a tetanus shot. (Doc. No. 32-2). Dixon claimed that the nurse did not give him the opportunity to "say anything," because the two had problems with "smart-mouthing" one another in the past. (Dixon Dep. at 36:14-24). Dixon stated that he did not ask for further treatment after the nurse repaired a wound on his ear, because she sent him away immediately. (*Id.* at 38:2-15).

In contrast to Dixon's account, Officer Neubacher recalled that Dixon was screaming at the nurse. (Neubacher Dep. at 18:13-19).  Officer Naus stated that Dixon's unruliness and foul language limited the nurse's ability to render treatment. (Naus Dep. at 30:22-25).  Prison records indicate that Plaintiff's clinic check ended due to his hostile behavior toward the nurse. (Doc. No. 32-2).  Another portion of those records reflect that Dixon told the nurse he was "ok" and wanted to go outside to get fresh air. (*Id.*).

Approximately one and a half years after his encounter with Officer Neubacher, on June 23, 2013, Dixon requested medical care for a lump on the left side of his head. (Dixon Dep. at 45:13-25).  Dixon claimed the injury resulted from the October 2011 confrontation in his cell, but out of fear that he would be denied care, he did not mention this fact when he sought treatment. (*Id.*).

Although there were video cameras in the area outside of Dixon's cell, there is no video footage of the events that are the subject of this suit.  Angela Hunsinger, a prison official responsible for viewing any video footage, testified that the camera in front of Dixon's cell was inexplicably pointed askew, focused on a concrete pole rather than the area around the cell where it ought to have recorded. (Deposition of Angela Hunsinger at 21-22, Doc. No. 35).  Whatever video footage existed was not saved or given to the committee responsible for investigating Dixon's use of force claim. (*Id.* at 22-23).

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  It can discharge this burden in two ways: by

5

producing evidence to indicate there is no genuine issue of material fact, or by demonstrating that the nonmoving party fails to show sufficient evidence to establish the existence of an element essential to that party's case. *Id.*

If the moving party has met its burden, the nonmoving party "may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (*citing* Rule 56 and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The existence of a mere scintilla of evidence in support of the nonmoving party's position will not defeat a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). There must be evidence on which a jury could reasonably find for the nonmoving party. *Id.*

When reviewing summary judgment motions, a court must view the evidence, and the reasonable inferences that can be drawn from it, in a light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587. Cases proceed to trial, even if a party's evidence is inconsistent, because in reviewing a motion for summary judgment, weighing the evidence and making credibility determinations are prohibited. *Amerson v. Waterford Twp.*, 562 F. App'x 484, 488 (6th Cir. 2014) (*quoting Coble v. City of White House, Tenn.*, 634 F.3d 865, 870 (6th Cir. 2011)). Even so, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, "[t]he blatantly contradictory standard is a difficult one to meet and requires opposing evidence that is largely irrefutable." *Amerson*, 562 F. App'x at

489. "Facts that are not blatantly contradicted by [evidence such as a video] recording remain entitled to an interpretation most favorable to the non-moving party." *Coble*, 634 F.3d at 870.

## III.     LAW & ANALYSIS

### A.  Authentication of Defendants' Exhibits

As an initial matter, Plaintiff asserts that the Court cannot rely on certain documents Defendants attach to their motion for summary judgment.  Dixon states that these documents are not properly authenticated, and as a result, cannot be considered.

Federal Rule of Civil Procedure 56(c)(2) allows a party to object to evidence submitted in support of summary judgment on the ground that it cannot be presented in a form that would be admissible in evidence.  Fed. R. Civ. P. 56(c)(2).  Following an objection, the "burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."  Fed. R. Civ. P. 56 (2010 Advisory Committee comments).  Thus, the Rule provides for "a multi-step process by which a proponent may submit evidence, subject to objection by the opponent and an opportunity for the proponent to either authenticate the document or propose a method to doing so at trial." *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-CV-1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011).

The documents Plaintiff objects to are a medical examination report, a list of physician's orders, and a nursing assessment/protocol form. (Doc. Nos. 32-2, 32-3, and 32-4).  Defendants submit these documents with their motion for summary judgment, and include an affidavit from Diane Wuchich, an administrative professional at the Mansfield Correctional Institution. (Doc. No. 32-1).  In her affidavit, Ms. Wuchich stated that the attached "use of force report" was a true and correct copy of the original record. (*Id.*).

Pursuant to Federal Rule of Evidence 901, the requirement of authenticating or identifying an item of evidence as a condition precedent to admissibility can be satisfied by testimony of a witness with knowledge, attesting that "an item is what it is claimed to be." Fed. R. Evid. 901(a) and (b)(1).

The Court agrees with Dixon's assertion that the affidavit from Ms. Wuchich does not properly authenticate the list of physician's orders or nursing assessment form. (Doc. Nos. 32-3 and 32-4). These items are medical records and nothing on their faces suggests that they were part of a use of force report, which is the only item Ms. Wuchich addressed in her affidavit. However, with their reply brief, Defendants submit an affidavit from Roseanna Clagg, a health care administrator at the Southern Ohio Correctional Facility, in which she averred that the physician's orders and nursing assessment form were true and correct copies of the original documents. (Doc. No. 36-1). Ms. Clagg's testimony adequately authenticates these records.

Defendants maintain that Ms. Wuchich's affidavit authenticates the medical examination report, because the document was part of the use of force report issued after Dixon's interaction with Officer Neubacher. The medical examination report indicates that it arose by virtue of a "use of force." (Doc. No. 32-2). Given the use of force designation, the Court finds Ms. Wuchich's affidavit addressing the use of force report sufficient to authenticate the medical examination report.

**B. Excessive Use of Force**

The Eight Amendment shields inmates from the excessive use of force. Whitley v. Albers, 475 U.S. 312, 327 (1986). "In concrete terms, the Eight Amendment protects prisoners from being severely beaten, intentionally denied medical care for serious medical needs, [and]

recklessly subjected to violent attacks or sexual assaults." _Parrish v. Johnson_, 800 F.2d 600, 609 (6th Cir. 1986) (internal citations omitted).

However, not every shove or restraint by officers in the prison context gives rise to a constitutional violation. _Id._ at 604.  In some circumstances the "maintenance of prison security and discipline may require that inmates be subjected to physical contact actionable as assault under common law; even so, 'a violation of the Eighth Amendment will nevertheless occur if the offending conduct reflects an unnecessary and wanton infliction of pain.' " _Combs v. Wilkinson_, 315 F.3d 548, 556 (6th Cir. 2002) (_quoting Pelfrey v. Chambers_, 43 F.3d 1034, 1037 (6th Cir. 1995)).

An Eighth Amendment claim for excessive use of force has subjective and objective components. _Williams v. Curtin_, 631 F.3d 380, 383 (6th Cir. 2011) (_citing Moore v. Holbrook_, 2 F.3d 697, 700 (6th Cir. 1993)).  "The subjective component focuses on the state of mind of the prison officials." _Id._  The central inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." _Hudson v. McMillian_, 503 U.S. 1, 6 (1992).  To determine whether a prison official had a culpable state of mind, courts may consider the following factors: (1) the need for force, (2) the relationship between the need and the amount of force that was used, (3) the extent of the injury inflicted, (4) the extent of the threat to the safety of staff and inmates, and (5) any efforts made to temper the severity of a forceful response. _Whitley v. Albers_, 475 U.S. 312, 321 (1986).

The "objective component requires the pain inflicted be 'sufficiently serious.' " _Williams_, 631 F.3d at 383 (_quoting Wilson v. Seiter_, 501 U.S. 294, 298 (1991)).  This prong involves a "contextual" inquiry that is "responsive to contemporary standards of decency." _Hudson_, 503 U.S. at 8-9 (internal citation and quotation marks omitted).  The extent of a prisoner's injuries is

not dispositive of whether an Eight Amendment violation has occurred. *Wilkins v. Gaddy*, 559 U.S. 34, 36-39 (2010). As the Supreme Court has explained, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated . . . [w]hether or not significant injury is evident." *Hudson*, 503 U.S. at 9. "Otherwise, the Eight Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Id.*

### 1. Subjective prong

Defendant Neubacher argues that the force used against Dixon was necessary to maintain order and discipline. Defendant asserts that Dixon was a security Level 4 inmate, who was causing a disturbance that could potentially lead to chaos in his living unit. Officer Neubacher described Plaintiff as yelling and kicking on his door (Neubacher Dep. at 10:12-15), while Officer Naus testified that Plaintiff was instigating, as evidenced by the fact that the cellblock was louder after Plaintiff began his disruptive conduct. (Naus Dep. 18:19-22, 19:1-7). Defendant Neubacher points out that Plaintiff insisted on continuing his behavior even after he was twice directed to quiet down and his cell was searched.

Dixon admits that when Officer Neubacher asked him, for a second time, whether he would be quiet, he responded in the negative. (Dixon Dep. at 15:18-22). The maintenance of discipline at a correctional facility may require some means, such as a chemical agent or physical force, to be used to compel compliance. *See, e.g.*, *Jennings v. Mitchell*, 93 F. App'x 723 (6th Cir. 2004) (officers' use of pepper spray when an inmate disobeyed repeated direct orders to exit a shower was a good faith effort to maintain order). Yet, even assuming Officer Neubacher had a reasonable basis for employing force in light of Dixon's refusal to follow orders, Dixon's Eight Amendment claim would survive summary judgment. That is because sufficient questions

10

remain regarding whether the level of force used was appropriate under the circumstances, or instead, indicative of a malicious intent to cause harm.

An officer's plausible basis for using some force does not end the excessive force inquiry, as courts must consider the relationship between the need for force and the amount of force used. *Cordell v. McKinney*, 759 F.3d 573, 582 (6th Cir. 2014). Officers are permitted to use force to maintain discipline and order, but "it is not automatic that what corrections officers do in response is considered appropriate force." *Gamble v. Peavyhouse*, No. 5:12-CV-332, 2014 WL 5106360, at *11 (E.D. Ky Sept. 30, 2014).

For a number of reasons, a jury could find Officer Neubacher lacked a good faith reason to apply the extent of force Dixon describes. Dixon maintains that Officer Neubacher not only pepper sprayed him, but also grabbed him by his shirt and punched him in the face. The officer went on to sling Dixon headfirst toward a metal footlocker located on the floor of the cell so that Dixon struck his head on the locker.[1] (Dixon Dep. at 19:15-16). Officer Neubacher applied this level of force while Dixon stood with his hands cuffed behind his back, rendering him relatively restrained from taking physical action and unable to catch his fall. Prior to the application of force, Dixon had complied with the order to cuff up and entered the cell at Officer Neubacher's invitation. (*Id.* at 10:16-20). When force was applied, Dixon's version of the facts indicate that he was not aggressive, threatening, or disruptive, aside from telling Officer Neubacher that he would not be quiet. (*Id.* at 15-16, 46:23-47:4). Defendant has not cited authorities that suggest the level of force employed under these circumstances, responding to a restrained inmate's verbal refusal to quiet down, was reasonable and appropriate and cannot give rise to a question of wantonness or maliciousness as a matter of law.

---

[1] Defendant argues there is no evidence to show that Plaintiff was thrown "headfirst" into the footlocker. At this stage of the proceedings, the Court must accept Dixon's uncontradicted testimony in which he describes Officer Neubacher taking such action. (Dixon Dep. at 19:15-16).

Based on Dixon's account, which the Court must accept at this juncture, it is difficult to reconcile the threat of Dixon's conduct with the amount of force that Dixon claims Officer Neubacher used.  Defendant argues there was the potential for chaotic behavior to erupt due to Plaintiff yelling, kicking, and attempting to incite other prisoners.  However, Dixon explained that he was simply speaking loudly to another inmate across the pod. (Dixon Dep. at 9).  Because other inmates were also talking, Dixon stated that he had to raise his voice to be heard. (*Id.*).[2]

Furthermore, the facts do not demonstrate how Officer Neubacher could have perceived Dixon as posing a reasonable threat to himself or Officer Naus.  Dixon avers that he was in the cell upon Officer Neubacher's invitation, not because he had entered of his own accord. (*Id.* at 14:19-22).  His arms were cuffed behind his back, and he made no attempt to harm the officers. The only other person who had access to the area was Officer Naus.

Defendant Neubacher posits that he made efforts to moderate the force used by asking Dixon to be quiet and conducting a cell search to induce cooperation.   Nevertheless, the circumstances here raise sufficient questions as to whether the officer's conduct was unnecessary and disproportionate, going beyond an effort to maintain discipline to constitute a malicious and sadistic attempt to cause harm.

### 2.  Objective Component

In regard to the objective component of Dixon's excessive force claim, the question is whether a reasonable jury could conclude that the pain inflicted was sufficiently serious to offend contemporary standards of decency. *Cordell v. McKinney*, 759 F.3d 573, 585 (6th Cir. 2014). Here, Dixon testified that he suffered pain in his eyes from the pepper spray, a knot above his left

---

[2] Defendant asserts there is no dispute that Plaintiff was kicking his door and screaming. (Doc. No. 36 at p. 2).  In support of this conclusion, Defendant cites to a portion of Plaintiff's brief in opposition where Plaintiff quotes the following from Officer Neubacher's deposition: "the reason I searched his cell was because of him kicking and, yeah, screaming at the door." (Doc. No. 35 at p. 15).  The Court does not interpret Plaintiff's argument as an admission that he was kicking and screaming.

ear, a swollen jaw, and an abrasion on his chest. (Dixon Dep. at 44:9-19).  A medical examination report described Plaintiff as exhibiting swelling above the left ear, lacerations to the left side of the face, and a chest abrasion with some bleeding. (Doc. No. 32-2).  The nurse administered a skin stich and tetanus shot. (Doc. No. 32-3).  Plaintiff testified that after the altercation, albeit a year and a half later, he sought treatment for a bump on his head that had persisted since the incident. (Dixon Dep. at 45-46).

While Defendant Neubacher acknowledges that a prisoner need not show he suffered a significant injury to establish an Eight Amendment claim, he emphasizes that the absence of a serious injury is relevant.  Given that Dixon allegedly suffered what he characterizes as *de minimis* injury, Defendant asserts that the force used cannot be a constitutional violation.  In support of showing that Dixon suffered from only *de minimis* injury, Defendant argues that Dixon did not request medical attention after the altercation.  Additionally, Neubacher notes Plaintiff suffered only small lacerations and a bump, underwent minimal medical treatment, and exhibited verbal aggression toward the nurse during his examination.

Defendant relies on *Richmond v. Settles*, 450 F. App'x 448, 454 (6th Cir. 2011) where the Sixth Circuit affirmed a trial court's summary judgment dismissing a plaintiff's excessive force claim against prison staff.  The court found that the inmate suffered only a *de minimis* injury, basing its decision on an injury report which described "small superficial abrasions" on the inmate's elbow and shoulder but finding "no redness, swelling, heat or abrasion on his allegedly injured knee." *Id.*  The court also observed that the plaintiff's injuries did not require further medical treatment after the initial evaluation. *Id.*

The undersigned finds *Richmond* insufficient to support Defendant's arguments for two reasons, which were articulated in *Tucker v. Pentrich*, No. 09-13246, 2013 WL 4833612 (E.D.

13

Mich. Sept. 10, 2013). First, the *Richmond* court did not address the Supreme Court's holding in *Wilkins v. Gaddy*, 559 U.S. 34 (2010). *Tucker*, 2013 WL 4833612, at *6. *Wilkins* reaffirmed that a significant injury is not "a threshold requirement for an excessive force claim." *Id.* The central inquiry in an excessive force claim is not the extent of the injury, but instead, whether the force was "nontrivial" and "was applied maliciously and sadistically to cause harm." *Wilkins*, 559 U.S. at 39 (*quoting Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).

Second, the *Richmond* court's citation to *Hudson v. McMillian*, 503 U.S. 1 (1992) in support of its *de minimis* injury holding is dubious. *Tucker*, 2013 WL 4833612, at *6. In *Hudson*, the Supreme Court focused on *de minimis* force, not *de minimis* injury. *Id.* The *Hudson* Court explained that the Eighth Amendment did not "prohibit *de minimis* uses of *physical force*, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.' " *Hudson*, 503 U.S. at 9-10 (*quoting Whitley*, 475 U.S. at 327) (emphasis added). According to *Hudson*, whether or not significant injury is evidenced, contemporary standards of decency are always are violated when prison officials maliciously and sadistically use force to cause harm. *Id.* at 9.

Defendant also cites to *Harrison v. Gregg*, No. 1:12-CV-005, 2013 WL 5353188, at *8 (S.D. Ohio Sept. 24, 2013), where an inmate failed to establish that he suffered a discernible injury as a result of the physical force exerted. While the inmate alleged in his memorandum that he suffered from two black eyes, bruises, lumps, and a cut, he did not present sworn testimony, or any other evidence, supporting these allegations. *Id.* The court relied on a nurse's report that found the inmate suffered from only burning in his eyes due to mace and a miniscule cut. *Id.* Yet, this case is distinguishable from *Harrison* as Dixon presents evidence of more

notable injury, including swelling, pain in his eyes from the pepper spray, lacerations on his face, and a scrape on his chest, as were recounted in his testimony and prison reports.

Additionally, the Supreme Court has clarified that an inmate need not prove he suffered from any particular significant injury requiring medical attention in order to prove the objective component of an excess force claim, though the extent of injury remains relevant. *Wilkins*, 559 U.S. 34 at 37. Other courts have emphasized that the degree of the inmate's injury need not be significant. For example, in *Tucker v. Pentrich* a nurse's examination report found no injuries on the inmate. 2013 WL 4833612, at *6. Nevertheless, the officers' acts of kicking the plaintiff, standing on him, poking him in the eye and Adam's apple, and forcefully yanking his arms through a slot in his cell created a genuine issue of material fact regarding excessive force. *Id.*; *see also Williams v. Curtin*, 631 F.3d 380 (6th Cir. 2011) (prisoner sufficiently plead facts to support the objective component in his complaint when he alleged improper use of a chemical agent that caused a temporary spell of coughing and shortage of oxygen); *Brooks v. Yates*, No. 1:09-CV-922, 2012 WL 2115301 (S.D. Ohio Mar. 30, 2012) (officer's unprovoked act of striking an inmate's forehead with a can of Ensure was sufficient to preclude summary judgment, despite resulting in only a small bruise).

Accordingly, Dixon's escape from more serious harm is not fatal to his claim. Rather, his allegations of being punched and slung headfirst toward a metal footlocker, coupled with the use of a chemical agent, all of which caused some degree of injury, are sufficient to maintain his claim for excessive use of force.

### C.  Failure to Intervene

Plaintiff also maintains that Officer Naus violated the Eight Amendment by virtue of his failure to intervene during the assault. The Sixth Circuit has explained that "a correctional

officer who observes an unlawful beating may, nevertheless, be held liable under § 1983 without actively participating in the unlawful beating." _McHenry v. Chadwick_, 896 F.2d 184, 188 (6th Cir. 1990).  Generally, an officer will be found liable for failure to protect prisoners in the face of excessive force when "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." _Cole v. City of Dearborn_, 448 F. App'x 571, 577 (6th Cir. 2011) (_quoting Turner v. Scott_, 119 F.3d 425, 429 (6th Cir. 1997)).

Where an incident unfolds in matter of seconds, courts have been unwilling to hold officers liable for failure to intervene. _Ontha v. Rutherford Cnty, Tenn._, 222 F. App'x 498, 506 (6th Cir. 2007) (citing cases); _see, e.g._, _Kowolonek v. Moore_, 463 F. App'x 531, 539 (6th Cir. 2012) (police officers did not have the opportunity to intervene given the rapid sequence of events and the minimal time necessary to use a taser).  Conversely, a duty to protect has been recognized where the "underlying episode of excessive force has spanned a sufficient period of time for a nearby defendant to both perceive what was happening and intercede to stop it." _Ontha_, 222 F. App'x 506; _see, e.g._, _Durham v. Nu'Man_, 97 F.3d 862, 868 (6th Cir. 1996) (reversing award of summary judgment for the defendant where a beating "lasted approximately ten minutes" and the defendant nurse "watched the beating unfold on her monitor from the nurse's station, and then from the doorway of . . . the room where the beating took place").  Officers cannot be held liable under this theory if they do not have "a realistic opportunity to intervene and prevent harm." _Ontha_, 222 F. App'x at 507.

Dixon maintains that the circumstances surrounding the assault were sufficient to put Officer Naus on notice that excessive force was imminent.  Dixon argues that the cell search was motivated only by Officer Neubacher's frustration with Dixon, Neubacher did not conduct a true

16

cell search, and Officer Naus knew that Neubacher had his pepper spray ready before calling Dixon back into the cell.  Based on these facts, Dixon asserts that a jury could infer that Naus should have anticipated the assault.

Plaintiff has not set forth evidence sufficient to create a genuine dispute that Officer Naus should have known Neubacher intended to apply excessive force.  Corrections officers are entitled to take reasonable steps to gain inmates' compliance, and Plaintiff has presented no evidence to undermine Defendant's claim that the cell search, even if a sham, was a legitimate attempt to obtain Dixon's acquiescence.  The search does not signal that excessive force was to follow.  In regard to Officer Neubacher's handling pepper spray, Officer Naus testified it was standard procedure for an officer to have pepper spray pulled when entering an inmate's cell. (Naus Dep. at 33:7-13).  Moreover, in Dixon's account of the incident, Officer Neubacher did not grab the spray until after Dixon had re-entered the cell and told Neubacher that he would not be quiet. (Dixon Dep. at 15:20-25, 16).  As a result, this fact does not give rise to the conclusion that Naus should have anticipated Neubacher would pepper spray and assault Dixon.  Plaintiff does not argue Officer Neubacher gave a verbal warning or otherwise signaled that he would use force.

Alternatively, Dixon argues that Officer Naus must have been aware Neubacher was applying excessive force once the assault commenced.  Dixon's testimony places Naus on the side of the open cell door at the moment when Neubacher pulled his pepper spray. (Dixon Dep. at 15:25-16:5).  Officer Naus, however, contends that he could not see Neubacher raise his arm to spray Dixon. (Naus Dep. at 33:14-16).  Even assuming Naus was in a position to observe the force being applied by virtue of Dixon's testimony placing the officer at the cell door, Dixon has

failed to point to evidence sufficient for a jury to find that the application of force lasted long enough for Naus to recognize what was going on and intercede to stop it.

Dixon maintains that a jury could decided that Officer Naus had an opportunity to intervene based on the fact that Dixon and Officer Neubacher were in the cell together for a total of three to four minutes.  However, Dixon's testimony describes the physical altercation as a sequence of assaults that transpired in quick succession. (Dixon Dep. at 16-17).  As Dixon explains, he was grabbed by the shirt, punched, pepper sprayed, and "immediately" slung toward the locker box. (*Id.*).  Dixon does not assign time to the physical altercation itself.  Yet, based on Dixon's testimony, a reasonable jury could not conclude that the time frame during which Officer Naus had to realize Neubacher was applying excessive force, and place himself in a position to intervene, was longer than a few seconds.

Dixon further asserts that Officer Naus had enough time to close Dixon's cell door to prevent other inmates from seeing the assault, and as a result, one could infer that the officer had adequate time to intercede.  Yet, according to Dixon's deposition, Officer Naus did not pull the door closed until Dixon was already colliding with the footlocker and the physical altercation was over. (Dixon Dep. at 21:13-14).  As a result, this fact does not adequately demonstrate that Naus had enough time to act before the assault ended.  Additionally, if closing the door was an attempt to block third parties from viewing Neubacher's unlawful conduct as Dixon argues, Naus pulling the door shut after the assault had already commenced suggests that Naus was unaware of Neubacher's intent to exert unlawful force.  Accordingly, Plaintiff has not carried his burden to show that Defendant Naus unconstitutionally failed to intervene.

18

### D.  Qualified Immunity

Defendants argue that they are entitled to qualified immunity from liability on Dixon's Eight Amendment claims.  The qualified immunity doctrine "operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  A government official who is performing a discretionary function is entitled to qualified immunity from suit as long as his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

A defendant bears the initial burden of coming forward with facts which suggest that he was acting within the scope of his discretionary authority at the time in question. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992).  Defendants here have met their initial burden as it is uncontested that they were acting in their official capacities.  The burden of proof then shifts to the plaintiff, who ultimately must establish that a defendant is not entitled to qualified immunity. *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005).

Courts engage in a two-step analysis for resolving government officials' qualified immunity claims and have the discretion to decide which step to address first in light of the circumstances in the particular case. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  The two factors which are relevant to demonstrate whether a defendant is entitled to qualified immunity from suit are "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (internal citations omitted).

Regarding the "clearly established" right inquiry, the relevant question is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).  Whether the right was clearly established "must be undertaken in light of the specific context of the case, not as a general broad proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "In other words, where a constitutional violation exists, an officer's personal liability turns on the 'objective legal reasonableness' of the action in view of the circumstances the officer confronted assessed in light of 'clearly established' legal rules." *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004) (*citing Saucier*, 533 U.S. at 202; *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

Under either prong of the test, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.  This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a 'judge's function' at summary judgment is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' " *Tolan v. Cotton*, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014) (internal citations omitted).

Here, Plaintiff has not shown a constitutional violation as to Officer Naus's conduct. However, the Court has found that a jury could determine Defendant Neubacher violated Plaintiff's Eight Amendment rights in exerting excessive force.  The issue then is whether a reasonable officer in Neubacher's position would have understood that under the circumstances, his actions violated the Eight Amendment as of October 4, 2011.  A reasonable officer would know that grabbing, punching in the face, pepper spraying, and throwing a prisoner headfirst to the ground, while the prisoner is handcuffed and non-aggressive, would be an unreasonable application of force in the context of this case.  Therefore, Defendant Neubacher's request for qualified immunity cannot be granted at this time.

20

### E.  Deliberate Indifference to Medical Needs

Because it does not challenge the merits of all of Plaintiff's claims, Defendants' motion is actually one for partial summary judgment. Defendants conclude their motion for summary judgment by stating that the complaint should be dismissed, but they fail to set forth an argument addressing Plaintiff's Eighth Amendment claim for denial or delay of medical care.  The motion attacks only the Eight Amendment claims for excessive force and failure to intervene, and the state law claims of battery and assault.  The complaint, however, alleges that Defendants delayed in attending to Dixon's medical needs in violation of the Eight Amendment.   In their reply brief, Defendants fleetingly assert that there is no evidence showing the 30 minute delay in administering Dixon's medical treatment was due to error on their behalves.

It is the defendant's burden at the summary judgment stage to make an initial showing that the plaintiff lacks evidence for a claim. _Smith v. Campbell_, 250 F.3d 1032, 1036 (6th Cir. 2001).  Only when the defendant has made such a claim does the burden then shift to the plaintiff. _Id._  A reply brief is not the appropriate place to raise issues for the first time. _United States v. Perkins_, 994 F.2d 1184, 1191 (6th Cir. 1993).

Here, Defendants' failure to properly raise their argument in a summary judgment motion on the merits has relieved Dixon of the burden to come forward with specific facts. _See Hunter v. Caliber Sys., Inc._, 220 F.3d 702, 725-26 (6th Cir. 2000).  Accordingly, the Court will not examine the merits of Plaintiff's arguments that this claim should survive.  By virtue of Defendants' failure to move for summary judgment, the claim cannot be dismissed.

### F.  State Law Claims

Dixon's state law claims of assault and battery, which he asserts against Defendants in their individual capacities, cannot stand as they are barred by Ohio Revised Code §§ 9.86 and

21

2743.02(F). (Doc. No. 26).   Under section 9.86 of the Revised Code, state officials remain immune to state law claims brought against them in their individual capacities unless a determination has been made that those officials acted manifestly outside of the scope of their employment or official responsibilities, or otherwise acted with malicious purpose, in bad faith, or in a wanton or reckless manner.  Section 2743.02(F) explains that the Ohio Court of Claims has original jurisdiction to make the initial determination of whether officers are entitled to personal immunity under section 9.86.  In *Haynes v. Marshall*, 887 F.2d 700 (6th Cir. 1989), the Sixth Circuit explained how the two code provisions work together to preclude such claims:

> Ohio law requires that, as a condition precedent to asserting a cause of action against a state employee in his individual capacity, the Court of Claims must first determine that the employee is not entitled to the immunity provided for in Revised Code section 9.86.  Prior to that condition being satisfied, then, there is no claim under Ohio law upon which relief may be granted against state employees in their individual capacities.

887 F.2d at 705.

Dixon has not shown that the Ohio Court of Claims has determined Defendants are not entitled to immunity.  Accordingly, this Court lacks jurisdiction to hear Plaintiff's state law claims.

22

## IV.     CONCLUSION

For the foregoing reasons, the undersigned recommends that Defendants' Motion for Summary Judgment (Doc. No. 32) be DENIED as to the excessive force claim against Defendant Neubacher, but GRANTED as to the failure to intervene claim against Defendant Naus and the state law claims of battery and assault.

/s Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  January 27, 2015.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).